# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CHARLES O. OVERTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-10-292-FHS-SPS |
| | ) | |
| JAMES COTTON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

On August 5, 2010, plaintiff appearing *pro se* commenced this 42 U.S.C. § 1983 Complaint (Dkt. # 1).  This matter comes before the Court for consideration of all pending motions, to-wit: 1) Defendants' (Keith, Bowman, Jones and Cotton) Motion for Summary Judgment (Dkt. # 53); 2) Defendant's (O'Clair) Motion to Dismiss, or in the alternative for Summary Judgment (Dkt. # 59); 3) Plaintiff's Motion for copies of plaintiff's exhibits (Dkt. # 75); and 4) Plaintiff's Motion for Reconsideration (Dkt. # 80).

## I.  Background

Plaintiff, an inmate at the Davis Correctional Facility, in Holdenville, Oklahoma, brought this action pursuant to 42 U.S.C. § 1983, seeking $10,000.00 from each defendant in their individual capacity, an order requiring that he be provided with "factory sealed meals", and any costs incurred in filing this action.  Plaintiff alleges his Eighth Amendment rights to be free from cruel and unusual punishment were violated on August 14, 2009, when

the Corrections Corporation of America ("CCA") staff (Cotton, Gray,[1] Jones and Bowman) subjected him to a "substantial risk of serious harm and the denial (for three days) of access to adequate medical care and treatment" for a serious allergic reaction. Plaintiff further alleges his Eighth Amendment rights were again violated on August 17, 2009, by CCA staff (Jones) when he told her he needed to see the doctor and was told that the doctor had called in sick and it would be the next day (August 18, 2009) before a doctor would be available and, therefore, she could do nothing for him. A few hours later, another CCA officer saw plaintiff and got him medical attention.

Plaintiff also asserts that on August 23, 25 and 30, 2009, his Eighth Amendment rights were violated when Canteen Correctional Service ("Canteen") staff (O'Clair and other unnamed staff) continued to serve him food which he was allergic to even though they were aware he had been placed on a restricted diet for medical reasons. On October 30, 2009, plaintiff claims Defendant Keith, Warden of the Davis Correctional Facility, subjected him to a violation of his First Amendment rights by retaliating against him for filing grievances regarding this issue by taking away his "agreed to factory sealed meals."

## II. Undisputed Facts[2]

At the time of initiating this action, plaintiff was incarcerated in the Echo maximum security unit ("Echo Unit") at the Davis Correctional Facility ("Davis") located in

---

[1]The court's docket sheet reflects Defendant Gray has never been served a summons herein.

[2]The following facts are either undisputed–i.e., not specifically controverted by Overton in accordance with Local Civil Rule 56.1(c)–or are described in the light most favorable to Overton. Immaterial facts are omitted.

Holdenville, Oklahoma.  Davis is a privately-owned correctional facility that is owned and operated by CCA.  CCA contracts with the Oklahoma Department of Corrections to provide services relating to the confinement and supervision of inmates at Davis.  Canteen is a private company contracted to provide food services at Davis on behalf of and under the auspices, direction and control of CCA.

Due to the security issues involved, CCA continuously monitors the services Canteen provides and maintains strict control and supervision over Canteen's operations.  CCA has final authority with respect to all services provided at Davis and effectively dictates the manner, method and means by which Canteen fulfills its obligations.  Specifically, CCA establishes the specifications and pre-approves the menu for all meals that Canteen serves to the inmates, prescribes inmate diets, specifies the meal times, the type of food and beverages Canteen may serve and requires Canteen to modify the portion sizes and to substitute certain food items for inmates on restricted medical and/or religious diets.  For instance, CCA does not permit Canteen to serve pork in any of its meals and requires Canteen to serve meals only during specified times.  Canteen is also required to serve all meals to the general inmate population on compartment trays and may only provide plastic combination utensils commonly referred to as "sporks" for the inmates to use to eat.  Canteen must also serve inmates with restricted medical or religious diet prescriptions separately from the inmates with no dietary restrictions and follow a specific process to confirm that the meals served to those inmates conform to their restricted diets.  Dkt. # 59-1, at pp. 1-2, ¶s 3-4.

Defendant O'Clair is employed by Canteen as the Food Service Director at Davis. O'Clair is not a dietician or religious coordinator, and he has no involvement or input into prescribing, suspending, terminating or reinstating inmate diets, designing menus, establishing meal schedules or food service policies. Rather, he is responsible for ensuring Canteen provides food service at Davis in a cost effective manner that complies will all CCA food service and security policies and all pertinent government safety and sanitation regulations. Although O'Clair performs cost control, manages product inventory and supervises Canteen's operations, he is generally not personally involved with, the actual preparation and distribution of inmate meals. *Id.*, at p. 2, ¶ 5.

Canteen provides food service at Davis in accordance with CCA Food Service Operations Policy No. 11-1 (Dkt. # 59-2) and the CCA/Canteen Diet Reference Manual (Dkt. # 59-3). Medical diets are available for Davis inmates whose medical conditions require specific dietary restrictions to preserve their health and well-being, but Canteen's employees are not authorized to prescribe any such diets. Rather, the policies governing medical diet prescriptions require CCA's medical department to prescribe medical diets for inmates and to communicate any such diet prescriptions to Canteen via a written Therapeutic Diet Request form. Dkt. #59-2, at p. 6, ¶ H and Dkt. # 59-3 at pp. 6-8. Canteen is not permitted to serve a restricted diet meal to any inmate unless a diet order is issued in accordance with the aforementioned policies. Canteen is also required to monitor inmates with medically prescribed diets to ensure compliance with their prescribed diets. *Id.* Once a restricted

4

medical diet is prescribed for an inmate, Canteen is permitted to deviate from the diet only to the extent authorized by CCA's medical department.

In accordance with the policies, a Therapeutic Diet Request form was issued for plaintiff by CCA's medical department in or around October, 2008.  Dkt. 59-3, at p. 2. As a result, Canteen prepares meals for plaintiff in accordance with a modified version of the regular general population diet, excluding peas and carrots.  CCA's medical department subsequently renewed plaintiff's modified no peas or carrots Regular Diet prescription on or about February 5, 200, March 2, 2010 and March 1, 2011.  Dkt. 59-3, at pp. 4-6.

The modified regular diet meals Canteen prepares each day for plaintiff follows a five-week cycle menu that outlines three full meals per day, seven days a week, consisting of breakfast, lunch and dinner.  Dkt. # 59-3, at pp. 8-12.  Canteen is not permitted to deviate from the menu unless necessary to respond to production problem, product availability or security issues.  Any substitutions necessary under these circumstances are made from the same food group specified under the regular diet menu and are of comparable nutritional value. Dkt. # 59-1, at p. 5.  The regular diet menu outlines meals that provide approximately 3,000 calories per day, which exceeds the approximately 2,500 daily calories recommended by the National Academy of Sciences-National Research Council for sedentary adult males. Prior to its implementation, a dietician and CCA administration reviewed and approved the menu to ensure that the meals it outlines are nutritionally adequate.

To accommodate plaintiff's Therapeutic Diet Request, the regular diet meals that Canteen prepares for the plaintiff exclude peas and carrots from all meals by, substituting (a)

5

green beans for peas or mixed vegetables containing peas; (b) celery sticks for shredded lettuce or carrot sticks; and (c) plain rice for rice pilaf containing peas or carrots. Canteen also prepares separate items for plaintiff such as cole slaw and turkey chow mein without carrots. Dkt. # 59-1, at pp. 5-6, ¶ 15.

All inmates confined at Davis, including the plaintiff, receive their meals in their cells. For security reasons, however, CCA does not permit Canteen to directly serve and/or distribute the meals prepared for inmates confined in Echo Unit. Instead, CCA requires Canteen to place the meals prepared for it maximum security inmates on transportation carts for delivery to the units by inmates working under the supervision of CCA's correctional officers. *Id.*, at p. 6, ¶ 16.

Canteen determines what type of medical dietary modifications, if any, it must make to the meals it prepares for the inmates housed at Davis based on information received from CCA's medical department each week. Based upon the information received, Canteen maintains a "diet roster" containing the inmate's name, inmate number and his restricted diet prescription, which Canteen prints each morning and reviews in order to plan for the preparation of that day's restricted diet meals. To prepare restricted diet meals for inmates confined in Echo Unit, a Canteen staff member prepares labels bearing the unit, cell number and type of diet based upon the information contained in the diet roster. An inmate assigned to the kitchen area then affixes the labels to the meal trays. *Id.*, at ¶ 17.

After the inmate affixes the labels to the trays, they are stacked in the restricted diet preparation area and organized by the type of restricted diet. A Canteen staff member then

6

retrieves the ingredients for the restricted diet meals and provides the ingredients to the inmate cooks who prepare the restricted diet meals according to the menu corresponding with the diet specified in the label affixed to each tray. All non-standard restricted diet meals, like plaintiff's meals, are prepared first, followed by other restricted diets. Because the plaintiff's meals are prepared first, no utensils used to prepare meals with peas or carrots are used to prepare plaintiff's meals. A Canteen staff member monitors the preparation of the restricted diet meal trays for conformity with the diet specified on the label and any discrepancies detected are corrected before the meal trays leave the meal preparation line. After the restricted diet meals are prepared, they are stacked in groups of four to six trays, wrapped with cellophane and placed on a warming cart for transportation to the confinement units. *Id.*, at ¶ 18.

Canteen staff and inmate kitchen workers then transport the carts, along with the carts containing regular diet meal items, to Echo Unit and set up a regular diet meal assembly line in a small kitchen located in Echo Unit. After all of the regular diet meal trays are prepared and placed in carts for distribution, the restricted diet meal trays are unwrapped and placed on top of the carts. Canteen staff then calls CCA correctional officers assigned to each of the three pods in Echo Unit (A-C) to retrieve the carts, which are placed outside of the Echo Unit preparation area for pick-up. Upon reporting to the Echo Unit kitchen, CCA correctional officers meet with a Canteen staff member to confirm that the correct number and type of meals were prepared for each pod, and, if correct, the correctional officer signs a form verifying that the proper number and type of trays were prepared. Canteen's staff member

is notified of any discrepancies detected, which are corrected before CCA correctional officers take possession of the carts.  Upon completion of the CCA correctional officer's inspection, inmates and/or CCA correctional officers transport the carts to the specified pod for distribution by the inmate workers.  Once CCA correctional officers take possession of the meal carts, Canteen neither participates in nor retains control over the distribution or consumption of the meal trays.  *Id.*, at p. 7.

At the time their diets are prescribed, inmates with restricted diet prescriptions are instructed to alert CCA correctional officers on duty of any problems with their meals at the time the meals are delivered to their cells.  Upon receiving notification from an inmate of discrepancies that were somehow not detected during the assembly line inspection, an effort is made to correct the problem or to provide an alternative accommodation for the inmate during the same meal period to the extent possible.  *Id.*, at p. 8.

According to plaintiff's medical records, a nurses' Protocol sheet was completed on August 14, 2009 at 2100 hours (9:00 p.m.) by LPN Newton.[3]  At that time, plaintiff advised that he was allergic to peas/carrots and that the onset of his rash began "2 days ago" on his hands and spread to his feet and groin area.  Under "exposure to allergens," the nurse marked "unknown."  For associated symptoms, the only symptom indicated, at that time, by the nurse was "itching."  The nurse noted "redness" and plaintiff appeared to be in "mild distress;" but

---

[3]Plaintiff asserts in his Objection to the special report (Dkt. # 76) that the nursing protocol "is a false report."  Plaintiff does not, however, identify what is false about the notations within the nursing practice protocols, *i.e.* Exhibit 1 of the Special Report.  *See,* Dkt. # 52-1.  He claims only that the report was not completed on the date stated on the report.  Plaintiff, however, submitted the same nursing practice protocols as contained within the special report as part of the exhibits to his complaint.  *See,* Dkt. # 1-1, at p. 8.

his vital signs were normal.  Plaintiff was provided a tube of Hydrocortisone creme.
Additionally, plaintiff was prescribed Benadryl 25 mg.

Plaintiff was again seen by a nurse on August 16, 2009 at 1210 hours.  According to
the medical records, plaintiff stated "my tongue is swelling."  The nurse observed plaintiff's
tongue and found no sign of tongue swelling, stating it "appeared normal."  Additionally, the
nurse reported "I/M shows no sign or symptom of distress, smiling, sticking tongue out,
waiving at nurse.  I/M has been on Clindamycin and Bactrim for 30 days w/no signs or
symptoms of anaphylaxis.  No shortness of breath or difficulty breathing noted.  I/M states,
"if I don't see a Dr. tomorrow I am going to cut my wrist."  At that time, the nurse notified
mental health of the statement.

On August 17, 2009, at 1745 hours (5:45 p.m.), plaintiff's progress notes indicate he
was complaining of a rash all over his body.  The nurse observed plaintiff's hands were
swollen, he had red welts on his hand, arms, back and also in his groin area, and his tongue
was starting to swell.  The nurse notified the health provider and received orders to send
plaintiff to the medical unit for observation and treatment with Depemedrol 40 mg, Dex
(Dexamethasone) 10 mg, Prednisone 100 mg and Benadryl 25 mg.  At 1850 hours (6:50
p.m.), plaintiff was placed into cell # 7 and given injections of Depemedrol 40 mg (Injectable
methylprednisolone) and Dex 10 mg per the orders.  No signs of distress were noted in the
chart and plaintiff was held overnight in the medical unit for observation. While in the
medical cell, documentation indicates plaintiff was observed every thirty (30) minutes and

progress notes were made based upon these observations.   The progress notes at 11:20 p.m. indicate plaintiff was resting with his eyes closed and no signs of distress were noted.

On August 18, 2009, the observation of plaintiff continued.   While during the early morning hours plaintiff appeared to be getting better and he was observed several times without distress or complaints, by 9:00 a.m., a nurse observed swelling on his hand and across the bridge of his nose and a rash on his legs, back, arm and most of his body.   At 1845, the nurse noted the swelling to plaintiff's face had increased with swelling to the bridge of his nose and left eye and plaintiff indicated the Benadryl was not controlling his itching.   At 1850, new medications were ordered including IV fluids (saline) and Solu-Medrol) intravenous methylprednisolone. An IV was started at 19:10 and by 20:00, plaintiff indicated that his itching had decreased.   Additionally, the nurse noted that the swelling to his left eye had decreased.

Medical staff continued to monitor plaintiff on August 19, 2009, and by 10:15 the dosage of Solu-Medrol was increased.   By 1330, the progress notes indicate plaintiff was resting quietly on his bunk without complaint.   Additionally, the notes indicate plaintiff's respirations were even and unlabored and no distress was noted.   At 1700, plaintiff declined all oral medications except prednisone.   The nurse indicated that there was still some swelling to his face and eyes, but plaintiff was not itching.   Plaintiff's medication chart also reveals he was prescribed Diflucan 100mg and Tolnaftate 1% cream.

By 12:30 on August 20, 2009, no signs or symptoms of complications were observed and plaintiff was continued on his IV medications.   By 3:30, the nurse noted the swelling in

plaintiff's face had decreased and by 06:50 the nurse again noted the swelling in plaintiff's face had decreased and plaintiff stated he was feeling better.  At 10:30 the nurse indicated the hives on plaintiff were 90% resolved and plaintiff could return to his regular cell.

In or around mid-August, 2009, the CCA medical department called a meeting between Defendant O'Clair, the Davis Medical Director, the Davis Chaplain, an Assistant Warden and the plaintiff to discuss plaintiff's concerns about his modified no peas or carrots regular diet prescription.  During this meeting, plaintiff expressed generalized concerns about receiving meals that included peas and carrots.  When pressed for details, however, plaintiff did not identify any specific instances on which he had received meals contrary to his modified regular diet prescription.  Plaintiff, however, requested CCA administration direct Canteen to provide him with either sealed, prepackaged Kosher meals or hamburgers or other items prepared outside of the CCA kitchen.  Defendant O'Clair advised the meeting participants that most prepackaged Kosher meals contained peas and/or carrots, or derivatives thereof, and Canteen was not permitted to serve food prepared outside of the facility kitchen, such as hamburgers or sandwiches, to CCA inmates.  Following this meeting, Defendant O'Clair met with Canteen staff to ensure they were following all procedures for preparation of plaintiff's meals and directed them to closely monitor the preparation of plaintiff's meals.  Dkt. # 59-1, at pp. 8-9, ¶ 22.

Approximately one week later, Defendant O'Clair received a report from a Canteen staff member indicating plaintiff had allegedly received an incorrect meal tray, containing carrots.  The Canteen staff member also reported that, in response to the plaintiff's complaint,

11

the CCA correctional officer on duty prepared a substitute modified tray using standard regular diet utensils.  Upon further investigation, it was determined Canteen staff had properly prepared a no peas and no carrots restricted diet meal for the plaintiff, but the CCA correctional officer and/or inmate workers responsible for distributing inmate meal trays apparently delivered the wrong tray to plaintiff.  In response to this alleged incident, Defendant O'Clair directed Canteen staff to individually wrap the plaintiff's meal trays with cellophane before they left the main kitchen to ensure that the meals were delivered to CCA correctional officers without becoming cross-contaminated with peas and/or carrots.  *Id.*, at p. 9, ¶s 23 and 24.

Approximately one week later, Defendant O'Clair received another report from a Canteen staff member that plaintiff had allegedly received slivers of carrot in the shredded lettuce meal item prepared for him.  Upon investigating this matter, O'Clair learned that, although the shredded lettuce served to plaintiff excluded carrots, the shredded lettuce vendor utilized the same machines to prepare and package the lettuce served to plaintiff that it used for preparing and packaging the standard mixed salad containing carrots.  Despite being unable to verify plaintiff's allegation or confirm the source of the alleged carrot slivers, in an abundance of caution, Defendant O'Clair directed his staff to stop serving shredded lettuce to plaintiff and to substitute celery sticks or shredded cabbage for the shredded lettuce.  *Id.*, at pp. 9-10, at ¶25.

12

On September 1, 2009, the medical department requested plaintiff to allow them to draw blood from him in order to do an allergy test to confirm his alleged allergy to peas and carrots.  Plaintiff refused to sign the waiver allowing the blood test.

On September 1, 2009, Defendant O'Clair provided a memo to CCA staff on plaintiff's housing unit regarding plaintiff's special dietary concerns.  It stated:

> From this date the only personnel to make Inmate Overton tray will be Canteen Staff.  Meal that has been verified carrot and pea free and that no serving utensils contaminated by carrots or peas have been used to serve his meal.

On September 4, 2009, plaintiff submitted an emergency grievance (09-148) in which he requested that the warden, kitchen, and medical staff get together and write an order stating that he had a dietary need for a sealed container food like a TV dinner, with ingredients listed on the outside.  Plaintiff requested either 14 boxed meals or a combination of meals and snack lunches to reduce the risk of allergic reactions.   The grievance coordinator responded the same day with the following response:

> The grievance coordinator determined that this Grievance is appropriately submitted as an emergency.
>
> Further investigation and remedy is necessary; therefore, this response is **temporary** in nature.
>
> 1.   The offender will be provided factory sealed meals through Tuesday 09/08/2009.
>
> 2.   On Wednesday, 09/09/2009, a Final response to the grievance will be provided to the offender.

13

Pursuant to this directive, Defendant O'Clair selected and purchased a variety of prepackaged frozen meals that excluded peas or carrots from a local grocery store and directed Canteen staff to deliver the meals to Echo Unit's correctional officers so that they could heat them in a microwave before serving them to the plaintiff.

Thereafter, Roger Blackshear, Acting Warden at Davis and Defendant O'Clair, Food Services Director worked out a special meal procedure for the plaintiff, and Defendant O'Clair immediately instructed Canteen staff to follow the new procedures. On September 9, 2009, a Joint Memorandum was issued to the Canteen Staff and the Echo Unit Staff. This memorandum stated:

> Inmate Charles Overton, DOC #160301, has medically documented food allergies. The following procedures will be complied with:
>
> 1. A Special Dietary Meal Report (attached) will be completed and returned to the Warden's Office daily.
>
> 2. Canteen Services will prepare meals for Inmate Overton that contains no peas or carrots. Only a Canteen Services staff member (no inmate workers) will prepare each meal using no utensils or containers that have come into contact with peas or carrots. After preparation, each meal will be sealed by the Canteen Services staff member for delivery to Inmate Overton.
>
> 3. The Canteen Services staff member who prepares and seals Inmate Overton's meal will sign the Special Dietary Meal Report. By signing the report, the Staff Member is indicating that the meal was sealed by the Canteen Services staff member immediately upon preparation and plating, that the meal contains no peas and carrots, that the meal was prepared without coming into contact with peas or carrots, and that no utensils or containers that have come into contact with peas or carrots were used in the preparation of the meal.

14

4. The CCA staff member serving the meal to Inmate Overton will sign the Special Dietary Meal Report indicating that the meal was sealed when delivered to Inmate Overton.

5. Every Canteen Services staff member and CCA staff member handling Inmate Overton's meals will sign the Special Dietary Meal Report.

Then, as previously indicated by the grievance coordinator, a final response was provided to plaintiff, on September 9, 2009, memorializing to him the procedures which were being enacted to address the concerns of his emergency grievance (09-148). The final response outlined the same procedures set forth above from the Joint Memorandum. Although plaintiff refused to sign an acknowledgment that he had received this response, he did file an appeal from the grievance response. In his appeal, plaintiff stated:

My grievance appeal is that this solution perposed (sic) by the co-ordinator restricts only that now two or so staff will be held responsable (sic) for a cross contamination instead of dealing with my issue that cross contamination occurred 3 times after I had an allergic reaction that was serious enough to require me to be put on medical observation with medication and to insure (sic) that cross contamination did not occur after that day as staff had been addressed on this issue 2 prior times (known of) then to still have staff made my trays were (sic) there is still possible a chance that cross contamination could occur. this (sic) final response should be overturn (sic) and give me the relief requested.

On October 5, 2009, the grievance coordinator received a letter from the plaintiff complaining about the length of time the administrative process was taking and asking that she issue a waiver to the exhaustion requirement. Becky Adams, the Warden's Secretary responded to this letter as follows:

Mr. Overton:

15

> I am in receipt of your correspondence dated 10/01/2009. I have
> spoken with A.W. Blackshear this date and explained to him
> your concerns. He advised me that he would visit with you on
> 10/07/2009. I trust that all of your issues will be resolved at that
> time.

On October 14, 2009, Defendant Jones drafted a Memorandum to the plaintiff in response to plaintiff's Requests to Staff asking Ms. Jones to provide him a written statement of what happened on August 17, 2009. In her response, Ms. Jones stated:

> Inmate Overton I talked with you in segregation about what was
> happening to you. I answered a Request to staff that you stated
> these same things and I answered all your issues. I notified
> medical of the symptoms you were having. I noticed you had
> bumps, I am not a doctor I cannot diagnose you. All I can do is
> notifiey (sic) medical which I did. I did give you assistance.

Additionally, plaintiff requested a statement from Defendant Bowman and was provided with an Incident/Staff Report dated October 14, 2009, which stated:

> Sada Jones and myself were making rounds on Fox Bravo unit
> when we walked up on inmate Overton's cell # 160301. Inmate
> Overton told myself and U/M Jones that he felt like he had an
> allergy and needed medical help. Sada Jones and myself A/S
> Bowman told him we would tell medical and we did call it in to
> medical, after that I have no idea not being in the medical field.

On October 20, 2009, plaintiff filed grievances 09-199 and 09-203 wherein he again set out the allegations from August 14-17 and his contentions that he was denied medical treatment by Defendant Jones (09-199) and Defendant Bowman (09-203). In both of these grievances, plaintiff requested that he be allowed to exhaust his administrative remedies. On October 23, 2009, the both of these grievances were answered as follows:

> The grievant request to be allowed to complete his administrative remedies:
>
> After review of the Grievance and the Informal Resolution, which was attached thereto, it was determined that the grievant had access and did utilize the administrative remedies, i.e., Informal Resolution and Grievance.
>
> The grievant's request is GRANTED.  It was determined that the grievant's utilization of administrative remedies occurred.

Plaintiff appealed this decision to the Warden, asking that the Warden give him a final response and that he be allowed to exhaust his administrative remedies.  On November 5, 2009, the Warden made the following decision regarding this grievance:

> The grievant specifically requested "to be allowed to complete his Admin Remedies", it was GRANTED on 10/23/2009.  The grievant has, in fact, exhausted his Administrative Remedies as evidenced by the Grievance as a whole.

Plaintiff acknowledged receipt of this decision on November 8, 2009.

On November 6, 2009, Assistant Warden Blackshear drafted a memorandum to plaintiff documenting a meeting between plaintiff, the assistant warden and a Mrs. Adams concerning plaintiff's diet.  At that time, plaintiff was assured that his dietary issues had been resolved.  Plaintiff was advised that the assistant warden would monitor the dietary logs to ensure compliance with the protocol which had been developed.  Plaintiff was also told he would be referred to mental health for an evaluation per his request.

Additionally, on November 6, 2009, the Warden issued the following decision in response to plaintiff's grievance appeal:

The grievant requested that the Warden, Kitchen, and Medical get together and write an order stating that the grievant has a dietary meal for sealed container food, with ingredients on the outside of the box.

The Grievance Coordinator received the attached grievance on Friday, 09/04/2009, and deemed it an emergency and a temporary response was rendered on 09/04/2009.

On Wednesday, 09/09/2009, a Final Response was rendered.

On Thursday, 10/22/2009, it was discovered that the grievant filed an Appeal to the Final Response within the appropriate time frame; however, same was misplaced.

On Friday, 10/23/2009, a duplicate Appeal to the Final Response was received by the Grievance Coordinator.

On 10/22/2009 a meeting was held with the grievant, A.W. Blackshear, and Mrs. Adams, in this meeting and the grievant's diet was discussed.  The grievant was assured that his dietary issues were resolved and that there has been some lack of communication with staff.  At no time has staff been indifferent to his dietary and health care concerns.

CCA-Davis Correctional facility and the dietician from Canteen have been conferencing regarding the grievant's dietary meal needs.

The grievant's request that the Warden, Kitchen, and Medical get together and write an order stating that the grievant has a dietary meal for the sealed container food, with ingredients on the outside box is DENIED.

The following has or will occur:

    1.  A diet Schematic has been formulated in which the grievant's meals will be prepared.

    2.  The grievant will receive the same meal as general population; however, it will be per the

18

> schematic without peas, carrots, and either
> derivative.
>
> 3.  The meals will continue to be monitored by
> CCA and Canteen staff and the daily log sheet
> will be completed and forwarded to the Warden's
> Secretary.
>
> 4.  A.W. of Programs will review these logs to
> ensure compliance.
>
> 5.  Staff will continue to prepare your meals as
> previously outlined in the Grievant Coordinator's
> Final Response.
>
> 6.  The grievant will be referred to mental health
> for an evaluation (per your request).

Plaintiff acknowledged receipt of this decision on November 8, 2009.

Thereafter, on November 11, 2009, plaintiff filed grievance 09-220.  This grievance appears identical to grievances 09-200 and 09-203, except that plaintiff now complains about lack of action by Defendant Cotton during the August 14 - 17 incident.  He again asks to be allowed to complete his administrative remedies.  On November 21, 2009, this grievance was returned to plaintiff for failure to attach his informal resolution and advising plaintiff that informal resolutions should be submitted to his unit clerk so that they could be traced.

On November 20, 2009, plaintiff submitted grievance 09-228, complaining that the grievance coordinator had failed to respond to his requests.  On November 28, 2009, this grievance was also returned to plaintiff, again advising plaintiff he had not attached an informal resolution to his grievance and he needed to submit the informal resolution to the unit clerk.

19

On November 25, 2009, following the filing of grievance 09-220, Defendant Keith sent a letter to the plaintiff in which plaintiff was advised of OP-090124 Inmate/Offender Grievance Process, Section IX, which provides: "The appropriate reviewing authority may determine there is abuse or misuse of the grievance process, and may restrict the inmate's/offender's capacity to submit a grievance.  The abuse may be, but is not limited to: *the repeated submitting of grievances about an issue previously addressed by staff in their written response*."  Additionally, plaintiff was advised that the issue in grievance 09-220 had been addressed in Grievance Nos. 09-148, 09-199, 09-200, 09-203 and several Informal Resolutions, and Requests to Staff.  At that time, plaintiff was formally advised that continued abuse at any level of the grievance process would result in restrictions being imposed.  On December 13, 2009, plaintiff submitted another grievance resulting in grievance restrictions being placed on plaintiff's ability to file grievances for one year.

Since the memorandum of September 9, 2009, there is no indication that the plaintiff has complained that he has received or consumed any meal or meal items contrary to his prescribed dietary restriction.  Canteen does not maintain any policy, custom or practice of knowingly preparing and serving meals for consumption by inmates housed at Davis that are contrary to an inmate's prescribed medical dietary restrictions.  Rather, it is the policy, practice and custom of Canteen to serve nutritionally adequate meals that are (a) consistent with any medical dietary restriction prescribed for the inmates; and (b) prepared in a manner that complies with all CCA food service and security policies.

### III.  Legal Analysis

20

## A. Standard of review

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Klen v. City of Loveland, Colo.*, 661 F.3d 498, 508 (10th Cir. 2011). "However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Intern., Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The court cannot resolve material factual disputes at summary judgment based on conflicting affidavits. *Hall v. Bellmon*, 935 F.2d 106, 1111 (10th Cir. 1991). The mere existence of an alleged factual dispute, however, will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Only material factual disputes preclude summary judgment; immaterial disputes are irrelevant. *Hall*, 935 F.2d 1106, 1111 (10th Cir. 1991). Similarly, affidavits must be based on personal knowledge and set forth facts that would be admissible in evidence. *Id*. Conclusory or self-serving affidavits are not sufficient. *Id*. If the evidence, viewed in the light most favorable to the nonmovant, fails to show that there exists a genuine issue of material fact, the moving party is entitled to judgment as a matter of law. *See*, *Anderson*, 477 U.S. at 250 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;

there must be evidence on which the jury could reasonably find for the plaintiff.") A party seeking summary judgment can meet his burden of establishing the absence of a genuine issue of material fact and entitlement to judgment as a matter of law "simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  Additionally, if the moving party proves an absence of evidence regarding an issue on which the nonmoving party has the burden of proof at trial, the nonmoving party can defeat summary judgment only by designating with evidence outside of the pleadings "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Furthermore, a party cannot escape summary judgment with a "mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  A special report is treated as an affidavit and the plaintiff's complaint, if it alleges facts based upon the plaintiff's personal knowledge and is signed under penalty of perjury, is treated as an affidavit. *Hall*, *supra*.

## B.  Eighth Amendment Claims

In order to state a claim under § 1983, a plaintiff must 1) allege a violation of a right secured by the Constitution or laws of the United States and 2) demonstrate that the alleged deprivation was committed by a person acting under color of law.  *Hall v. Witteman*, 584 F.3d 859, 864 (10th Cir. 2009).  The Eighth Amendment's prohibition against cruel and unusual punishment imposes minimum requirements on prison officials in the treatment received by inmates.  Not every injury suffered by a prisoner at the hands of another,

however, translates into constitutional liability for prison officials. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In order for a violation of a convicted prisoner's Eighth Amendment rights due to inadequate medical care, the prisoner "must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs." *Wilson v. Seiter*, 501 U.S. 294, 297-299 (1991). *See also*, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). An Eighth Amendment claim has both an objective and subjective component. *Farmer*, *supra*. The objective component requires proof that the condition was "sufficiently serious." *Id*. To meet the objective component, "extreme deprivations are required . . . ." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The subjective component is met by a prison official who is deliberately indifferent to an inmate's health or safety. *Wilson v. Seiter*, 501 U.S. at 297. "[A]llegations of 'inadvertent failure to provide adequate medical care,' or of a 'negligent . . . diagnos[is],' simply fail to establish the requisite culpable state of mind." *Id.* (citations omitted) Furthermore,

> . . . . a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble*, 429 U.S. at 106.

To show deliberate indifference to his serious medical needs the plaintiff must demonstrate that prison officials "refused to treat him, ignored his complaints, intentionally

treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). "Medical records of sick calls, examinations, diagnoses and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995).

### 1. Count One

Plaintiff alleges he was subjected to cruel and unusual punishment on August 14, 2009, by Defendants Cotton, Gray, Jones and Bowman because they subjected him to a "substantial risk of serious harm and the denial of access to adequate medical care and treatment" for failing to properly respond to his "serious allergic reaction." Specifically, plaintiff asserts he told the pod officers that he was experiencing an allergic reaction and showed Officer Craig a "red rash." After waiting for several hours, plaintiff states he spoke with Defendant Cotton and asked that he receive "emergency medical attention." At that time, plaintiff claims Defendant Cotton stated out loud "someone call medical for him." Plaintiff alleges no one paid attention to Defendant Cotton's remarks. Plaintiff asserts he then spoke with Defendant Jones and told her he had been waiting for three hours and she said she would get back with him, but she never came back. Plaintiff alleges he then spoke with Defendant Bowman telling Bowman that his condition was a "medical emergency," but Defendant Bowman gave him no help. Finally, plaintiff states he spoke with Defendant Gray telling him that he had been trying unsuccessfully to get medical attention for the past few

24

hours.   According to plaintiff, Defendant Gray advised plaintiff he was not going into anaphylactic shock and that he would be okay.  Plaintiff's complaint further alleges he was unable to get "adequate medical care" for three days or until August 17, 2009.

According to the special report, however, plaintiff was seen by medical personnel beginning on August 14, 2009 and was provided, on that date, a tube of Hydrocortisone creme and Benadryl 25 mg.  Furthermore, Defendant Cotton personally contacted medical to advise them of plaintiff's condition and was advised that medical was aware of plaintiff's issues, but they would look at him again.  Additionally, Defendant Cotton was told plaintiff had been given some creme.  *See*, Dkt. 1-1, at p. 39.  Moreover, the special report documents medical staff were, in fact, monitoring plaintiff's condition.  While plaintiff complains of a delay in his treatment, "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm." *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). *See also*, *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).  A prisoner's disagreement with medical staff over treatment does not give rise to a constitutional claim. *Monmouth County correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326 (3rd Cir. 1987) (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) and *Massey v. Hutto*, 545 F.2d 45, 46 (8th Cir. 1976)).

The documentation attached to the complaint, as well as contained within the special report, indicates plaintiff advised the nurse on August 14, 2009, at 2100, he was allergic to peas/carrots and the onset of his rash was "two days ago." Although it is clear an allergic

reaction could constitute a serious medical need, plaintiff has provided nothing but his conclusory statements that his allergic reaction was due to his ingestion of peas and/or carrots.  Further, plaintiff has not provided any documentation to establish Defendants Cotton, Gray, Jones and Bowman were aware, prior to his initial complaints to them on August 14, 2009, he had been exposed to the peas and/or carrots in his meal.  Plaintiff has refused to allow blood to be drawn to allow documentation of his alleged allergies to peas/carrots.[4]

Plaintiff's medical records establish beyond any doubt CCA medical staff were aware of plaintiff's medical issues, monitored his status and timely provided appropriate treatment. Because plaintiff has failed to provide evidence from which the finder of fact could conclude that Defendants Cotton, Gray, Jones or Bowman were deliberately indifferent to a serious medical need, defendants' motion for summary judgment (Dkt. # 53)  is GRANTED as to all allegations contained in Count I of plaintiff's complaint.

## 2.  Count Two

Plaintiff alleges he was again subjected to cruel and unusual punishment subjecting him to a substantial risk of serious harm when he was denied adequate medical care and treatment on August 17, 2009, by Defendant Jones refusing to get him medical help and telling him the doctor had called in sick and would not be available until the next day

---

[4]Plaintiff has offered no reason for his refusal to submit to a blood test for allergy testing.  If plaintiff were really concerned about what caused his allergic reaction as opposed to simply wanting to dictate specific meal requirements be imposed upon CCA and/or Canteen, he would consent to the requested blood work thus confirming he does not have any other underlying food allergies.

(August 18, 2009). Again, however, the uncontested documentation provided not only in the special report but also in the exhibit to plaintiff's complaint, establishes Defendant Jones notified medical of the symptoms plaintiff was having. *See*, Dkt. # 1-1, at pp. 21 and 28. Additionally, the medical records reveal plaintiff was, in fact, seen by medical personnel on August 14, 16, and 17, 2009. Thus, plaintiff has failed to establish that Defendant Jones was deliberately indifferent to his medical needs on August 17, 2009, or that she prevented him from receiving treatment or denied him access to medical personnel capable of evaluating his need for treatment. Accordingly, defendant's motion for summary judgment (Dkt. # 53) is GRANTED as to all allegations contained in Count II of plaintiff's complaint.

### 3. Count Three

Next, plaintiff asserts on August 23rd, 25th, and 30th, 2009, Defendant O'Clair and other unnamed kitchen staff were deliberately indifferent to his "doctor's ordered medical needs" when they continued to serve him "dietary 'allegic' (sic) restricted food" which he was "seriously allergic to" and they failed to properly address the issue when problems were brought to their attention by the facility director. Plaintiff's complaint against Defendant O'Clair appears to be premised on a theory of respondeat superior. Specifically, plaintiff asserts O'Clair, as Food Services Director, is ultimately responsible for failing to properly address problems dealing with plaintiff's meals when it was brought to his attention that there might be a problem. Plaintiff does not, however, allege that O'Clair personally prepared his meals, was personally involved in the distribution of his meals or any other conduct allegedly violating plaintiff's constitutional rights.

27

Personal participation is essential for individual liability under 42 U.S.C. § 1983.  *See Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976).  A defendant in a § 1983 action can not be held liable under a theory of respondent superior.  *Ledbetter v. City of Topeka,* 318 F.2d 1183, 1187 (10th Cir. 1996).  *See also*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  While Defendant O'Clair did attempt to address plaintiff's problems concerning his meals, there is no allegation this defendant intentionally and knowingly allowed plaintiff to receive deficient meals.  In fact, there is no evidence plaintiff actually received any meals that contained peas and/or carrots.  Rather, all of plaintiff's allegations that his allergic reaction was caused by being served meals containing pea and/or carrots are conclusory.  Plaintiff has not submitted any medical documentation to establish that the allergic reaction which he experienced on or about August 14, 2009, was the result of his allergy to peas and/or carrots.  Furthermore, even though plaintiff was subsequent to this allergic reaction served a meal on two separate occasions which might have contained peas/or carrots, plaintiff does not provide any allegations that he suffered actual physical harm from either of those two meals.  Instead, he complained, and the undisputed facts establish, Defendant O'Clair investigated the complaints and attempted to resolve them in accordance with established policies and procedures.  The facts simply do not establish that Defendant O'Clair was deliberately indifferent to plaintiff's serious medical needs.

Additionally, while the Eighth Amendment guarantees that inmates will receive the basic necessity of nutritionally adequate food, *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006), they are not entitled to the "amenities, conveniences and services of a good

hotel." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988).  The Constitution does not require prison officials to prepare a medical diet in the manner requested by plaintiff. Minimal standards of decency were clearly met in this case and plaintiff has failed to state a claim for relief against Defendant O'Clair.  Accordingly, Defendant O'Clair's motion for summary judgment (Dkt. # 59) is hereby GRANTED as to all allegations contained in Count Three of plaintiff's complaint.

### 4.  Count Four

In Count Four of his complaint, plaintiff alleges on October 30, 2009, Defendant Keith, Warden at Davis, violated his First Amendment rights by placing restrictions on his grievance procedures in retaliation for utilizing the inmate grievance process.  It is well settled that "prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998).   But "an inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity." *Id.*  Thus, to prevail on a claim for retaliation, a prisoner must show that, "but for" the retaliatory motive, the adverse action would not have taken place. *Id.*  "An inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Id.*  (citations omitted) (emphasis in original).

Prison regulations which impinge on an inmate's constitutional rights will be valid if they are reasonably related to legitimate penological interests.  *Jones v. Salt Lake County*,

503 F.3d 1147 (10th Cir. 2007) (quoting *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Several factors must be considered in determining the reasonableness of the regulation. "First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2262. Second, the court must consider "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.*, 482 U.S. at 90, 107 S.Ct. 2254. "Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" *Id.* (quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)). Third, courts look at the impact an accommodation of the asserted right will have on guards, other inmates and prison resources. *Turner*, *supra*. Finally, courts consider whether "obvious, easy alternatives exist that fully accommodate inmates' rights at de minimis cost to valid penological interests. *Jones*, 503 F.3d at 1154.

In this case, only after plaintiff's continuous filing of grievances over the same medical incident was he warned by the Warden that "the repeated submitting of grievances about an issue previously addressed by staff in their written response" could be deemed an abuse or misuse of the grievance process. When plaintiff submitted an additional grievance, the warden responded by advising plaintiff that he was being placed on

> . . . . . GRIEVANCE RESTRICTION from this date, January 06,
> 2010, until January 05, 2011.

Future grievance submitted will result in the immediate return of the grievance without a finding or response. If this action is taken at the first level of review, the action is appealable to the appropriate administrative review authority.

In all grievances submitted during the restriction period, you will be required to show cause why you should be permitted to grieve. You will submit a duly verified affidavit, made under penalty of discipline for lying to staff, attached to the grievance stating that all contents of the grievance are true and correct to the best of the inmate's/offender's knowledge and belief. The affidavit will also contain a list by grievance number, date, description, and disposition at each level, of all grievances previously submitted by the inmate/offender within the last 12 months.

Dkt. # 52-11, at p. 71.

Based upon the record herein, it is undisputed that plaintiff filed in excess of five grievances, several informal resolutions and requests to staff over the same medical incident. Given this unopposed evidence, it appears the limitations placed upon plaintiff's ability to continue to file grievances were justified and reasonable under the circumstances and do not amount to a violation of plaintiff's First Amendment rights. Plaintiff has not disputed defendant's legitimate and nonretaliatory reason for placing restrictions on his grievance rights, *i.e.* plaintiff was abusing the grievance process. Further, plaintiff has not alleged that he was denied access to the courts or any medical care or treatment in retaliation for filing these grievances. Additionally, plaintiff has not been deprived of ever filing another grievance; rather, reasonable restrictions have been placed on his ability to file to ensure plaintiff does not abuse the system. In light of the number of inmates within the prison system, this Court finds placement of these restrictions further important penological

31

interests, *i.e.* insuring that all valid inmate grievances will be heard.  Thus, this Court finds plaintiff has failed to establish the grievance restrictions are unrelated to a legitimate prison policy or that his request was denied in retaliation for him having exercised his constitutional rights.  Accordingly, defendant's motion for summary judgment (Dkt. # 53) is GRANTED as to all allegations contained in Count Four of plaintiff's complaint.

**C.  Motion to reconsider plaintiff's request for counsel**

After carefully reviewing plaintiff's complaint and ruling on all pending motions, this Court hereby denies plaintiff's motion to reconsider (Dkt. # 80) its Opinion and Order Denying Motion for Appointment of Counsel (Dkt. # 73).  Accordingly, plaintiff's motion (Dkt. # 80) is hereby DENIED.

**D.  Motion to require Davis to make copies for plaintiff at the court's expense**

Plaintiff requests this Court to order Davis to make copies of his legal documents at the court's expense (Dkt. # 75).  Plaintiff claims because this Court found him indigent in December of 2010, the court should bear all of his copy costs to pursue this litigation. Plaintiff does not cite any authority for his request and this Court knows of none.  Granting a plaintiff leave to proceed *in forma pauperis*, without the payment of the "fees and costs" referenced in 28 U.S.C. § 1915(a), does not authorize this court to bear the costs of all of plaintiff's copy needs. Further, plaintiff has not alleged that he does not currently have sufficient funds in his inmate account to pay for such costs.  Accordingly, plaintiff's motion (Dkt. # 75) is hereby DENIED.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court finds the evidence, viewed in the light most favorable to the plaintiff, fails to establish any genuine issues of material fact. Therefore, the defendants are entitled to summary judgment as a matter of law. Further, pursuant to 28 U.S.C. § 1915(g), this Court finds this action was frivolous and therefore, this dismissal counts as a strike under the Prisoner Litigation Reform Act.

**ACCORDINGLY, IT IS HEREBY ORDERED that:**

1. Defendants' (Keith, Bowman, Jones and Cotton) motion for summary judgment (Dkt. # 53) is GRANTED.

2. Defendant O'Claire's motion for summary judgment (Dkt. # 59) is GRANTED.

3. Plaintiff's motion to reconsider (Dkt. # 80) is DENIED.

4. Plaintiff's motion to require Davis to make copies for plaintiff at the court's expense (Dkt. # 75) is DENIED.

5. A separate judgment shall be entered in favor of all of the defendants and against plaintiff, dismissing this action with prejudice.

6. Plaintiff remains obligated to pay in monthly installments the **$350.00** filing fee incurred in this matter.

It is so ordered on this 30th day of March, 2012.

Frank H. Seay
United States District Judge
Eastern District of Oklahoma